IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA

v.  CRIMINAL ACTION NO. 1:08cr42

JOHN D. WASHINGTON,
         Defendant.

## REPORT AND RECOMMENDATION/OPINION

On July 2, 2008, came the defendant, John D. Washington, in person and by his counsel, Katy J. Ratai and L. Richard Walker, and also came the United States by its Assistant United States Attorney, Zelda Wesley, for hearing on Defendant's Motion to Suppress [Docket Entry 15] filed on June 23, 2008.

The undersigned received the testimony of City of Fairmont Police Officer Aaron Dalton and received a tape of the 911 call as an exhibit in evidence.

## Findings of Fact

Upon consideration of the testimony of Patrolman Dalton and the exhibit filed and made a part of the record during the hearing of July 2, 2008, the undersigned recommends the following findings of fact:

On October 2, 2007, at about 5:15 p.m., a 911 call was received from a woman at the Fairmont Hills Apartments in Marion County, West Virginia, as follows:[1]

911 Caller:   Hi. This is, uh, Fairmont Hills Apartments.

911:   Yes, Ma'am.

Caller:   Um, can I get some officers to come and patrol my, uh, parking lot? I got some drug

---

[1] The Court notes this is a rough translation of the tape of the 911 call, not from an official transcript.

| | |
|---|---|
| | dealers out here. I don't want 'em here. |
| 911: | Ok. Are they in any particular vehicle? |
| Caller: | They're out here now, sitting underneath of the pavilion. And they are, they do ride in a white car. I don't know what the name of this car is. I hate to go out here and be so obvious. |
| 911: | Ok, you don't have to, I can just tell them it's a white vehicle. What's your name, ma'am? |
| Caller: | My name is Miss Douglas – Jewel Douglas. I'm in the office now. Here comes my maintenance man, wait a minute, let me go ask him . . . . |

The response of the maintenance man, whom she called Anthony, was unintelligible. The 911 dispatcher told Ms. Jewel she would have officers sent there.

The Fairmont Hills Apartment Complex was called "The Carter" by area residents. It was also referred to as "New Jack City" and "Crack Haven." Ptl Dalton stated: It had an "inner-city tone" or drug culture; there was "a lot" of drug activity there; calls for police to go there were received fairly frequently; and he himself was dispatched there at least once a week. Based upon his experience, Ptl. Dalton considered the Fairmont Hills Apartments an area that has "a lot of drug activity occurring."

Officer Dalton was dispatched to the Fairmont Hills Apartments. He drove there in a marked patrol car with Patrolman John Miller whom he was training. They arrived only a few minutes after the 911 call. Upon pulling into the parking lot, Ptl. Dalton observed a white Chevy Caprice in front of the pavilion area, with two black males inside. Defendant was in the driver's seat and another man, Howard English, was in the front passenger seat. Ptl. Dalton had seen both men before, and

2

had spoken with Defendant previously while patrolling the area. He did not ever arrest either man, to his knowledge, but had just seen and spoken with them.

Ptl. Dalton pulled up directly in front of the white vehicle. As he was pulling up, Defendant saw him and exited to the rear of the vehicle and walked toward the pavilion. The other individual remained in the white car. There was no other vehicle matching the 911 caller's description in the area. There were other cars in the area, but no white cars and no cars with people in them.

Ptl. Dalton believed his presence was the reason for Defendant exiting the car and walking away. Defendant was walking away quickly, looking back over his shoulder, with his hands down around the area of his waistband. Ptl. Dalton then called out to Defendant, stating that Defendant "needed to stop– he needed to speak with him." Defendant stopped. Ptl. Dalton told Defendant why the officers were there– that they had received a 911 call about drug transactions taking place in the area, and his car matched the description provided by the caller. He asked Defendant if he had seen anything or if he had any knowledge of what was going on – "basically investigate the call."

Ptl. Dalton observed Defendant's demeanor, which he described as "very nervous." He had spoken with Defendant in the recent past, and his demeanor had been "completely different" on that occasion. Defendant's body was "shaking all over." There was visible perspiration on his face. His voice sounded nervous. Ptl. Dalton asked Defendant if there was anything in his possession that the officer needed to know about. He asked if there was drug activity going on. He asked Defendant "why he was so nervous." Defendant told Ptl. Dalton that he didn't want him (Dalton) to arrest him for what was in his pocket. Ptl. Dalton told him if he had just a small amount of marijuana in his pocket or something of that nature, and gave it to him, there probably wouldn't be any issue. At that point Defendant pulled out a small baggie containing what appeared to be marijuana from his

front pants pocket.

Defendant's turning over the marijuana "did not seem to relieve Mr. Washington's anxiety." Ptl. Dalton then "knew there was something more there," stating: "I began to become fearful from [Washington's] demeanor. He began to scare me." Defendant was holding onto the front of his pants. Ptl. Dalton asked Defendant: "Do you have a gun on your person?" Defendant responded, "Yes." He looked down toward his crotch area in his trousers and told the officer that's where the gun was located. Ptl. Dalton recovered a loaded Ruger P90 45 automatic hand gun from the front of Defendant's waistband. He placed Defendant in handcuffs and detained him there. He was arrested on the scene. Ptl. Dalton did a more detailed search after the arrest. Defendant was also strip searched after he was transported to the station.

The search of Defendant turned up a large amount of cash, between 1,700 and 1,800 dollars. No other weapons or any drugs were found on Defendant. Howard English was also searched and arrested and taken to the police station. He was informed by Officer Frederick of the Mon Valley Drug Task Force that he had better surrender any illegal drugs he had on his person before he was transported to the North Central Regional Jail, because he could otherwise be charged with bringing drugs into the jail– a more serious offense. English reached under his stomach area and produced a baggie containing off-white rock-like substances which Howard said were crack cocaine.

Upon cross examination, Ptl. Dalton testified that he had not heard the 911 call until it was played in Court. The dispatcher had not told him there were "drug dealers" "under the pavilion." Instead he was told there was "drug activity." When he ordered Defendant to stop, Defendant was not under the pavilion. When he first saw Defendant, he was in a white vehicle "real close" to the pavilion. He also noted that the pavilion was "really close" to the parking area. Ptl. Dalton

4

observed the white car, but never saw anyone walk up to or away from it (except Defendant). He did not see any drugs; he did not observe a possible drug buy; he did not see the passenger with drugs; he did not see any drugs inside or outside the car. He did not see a gun inside or outside the car or on either person in the car. He testified that the car was stopped, and was not running, and was therefore not committing any traffic violations. He did not see anyone doing anything illegal. He did not observe any criminal activity. Ptl. Dalton did not know if Defendant was living at the apartment complex. He did not know the 911 caller. He did not know if she had called before. He personally did not know of her reliability.

Ptl. Dalton did not recall ever making any drug arrests at the apartment complex, although he believed the Drug Task Force had. He did not know how many. He would at times make two to three arrests there in one week for other matters, then none for a period of time. He testified there was a "large concentration of people – it's a low-income area." There were a lot more calls there than in the surrounding, more sparsely-populated area. A lot of the arrests were for "domestics" and alcohol.

As Ptl. Dalton pulled up in his marked patrol car, Defendant exited the driver's side door, and walked quickly away from him, toward the back of the car. Defendant was not running when he left the car, but was walking quickly away from the car, looking back over his shoulder. He appeared nervous. Ptl. Dalton stated that it did not appear to him that Defendant exited and walked away from the car in a manner "like, ok, gotta get something from my house." Ptl. Dalton perceived as he was pulling up that Defendant exited and left because the officers were there.

Ptl. Dalton's words to Defendant were, in effect: "Stop! I want to talk to you." He spoke "loud enough to get his [Defendant's] attention." He did not raise his gun or put his hand on his

5

gun.  Defendant stopped.  Ptl. Dalton later testified he had said to the effect, "Sir, you need to stop. I'd like to speak with you for a minute."  In calling to Defendant, Ptl. Dalton used a "commanding voice."  The Court inquired of Ptl. Dalton what he would have done had Defendant not stopped, and the officer replied that he probably would have chased him.

On cross examination, Ptl. Dalton recited his version of the contact with Defendant.  1) He could tell Defendant was "very nervous," stating, "You appear to be very nervous while I'm speaking with you.  Different from when I spoke with you before.  Is there something going on here that you need to tell me about, you know, why are you so nervous?"  2) Defendant replied, "I don't wanna be arrested for what I have in my pocket."  3) Ptl. Dalton told him, "If you have a substance in your pocket, drugs, and small amount, you might not be arrested for it, if you're honest about it – you know, you give it to me, we can get this situation cleared up."  4) Defendant said "Ok," and pulled out a baggie from his front trouser pocket that appeared to contain a small amount of marijuana.  5) It appeared to be an amount that would be indicative of personal use.  6) After he gave the officer the marijuana, however, it "did not seem to relieve his being nervous."  7) Ptl. Dalton continued to speak with Defendant.  8) Defendant still appeared to be very nervous, grabbing for the front of his pants, reaching for something in his pants, reaching for his belt and slightly below with both hands, pressing his hands against his body.  9) Ptl. Dalton became alarmed and said, "I think there's something else going on here.  Do you have a gun?"  10) Defendant said, "Yes," in a very calm voice and looked down at his crotch.  11) Ptl. Dalton asked Defendant if the gun was in his waistband, and Defendant replied, "Yes."  12) Ptl. Dalton said, "Let me get it."  13) Ptl. Dalton testified the gun was a full-size 45 automatic in an "inside-the-waist" clip-type holster.  14) He took it and the case.  15) He then asked Defendant to turn around, and handcuffed him.  16) Defendant

6

was very cooperative, did not resist, and did not cause any problems.

Ptl. Dalton had not heard the actual 911 call when he was dispatched to the Fairmont Hills Apartments, so his responses at the hearing regarding the content of the actual call were from hearing the call during the hearing. He testified that what he was actually told by his dispatcher on October 2, 2007, was that there was a white vehicle, with drug activity going on in or around the vehicle. He repeated that he remembered either the vehicle was occupied or there were people around the vehicle, parked near the pavilion, with drug activity taking place. He believed that if a person called 911 to report "drug dealers" but the dispatcher told him there was drug activity, the two were usually associated. "Someone's probably not gonna call the police and ask for police assistance just because someone . . . I mean, they may, in some instances, call in and say, 'hey, there are people here who are drugs dealers,' we get all kinds of bizarre calls. But, in this situation, my thinking while I was responding and the way it was dispatched to me, was that this was drug activity taking place and they wanted an officer to come."

## Contentions of the Parties

Defendant contends the original stop was invalid because it was based on "very meager" evidence : that the tip provided to the police carried no indicia of reliability regarding its assertion of illegal activity, and therefore, could not establish the reasonable suspicion necessary to support an investigative stop; that the only information Officer Dalton had was that a call had been received by the dispatcher about the presence of so-called drug dealers in the area; that the caller did not describe any distinguishing features of the "drug dealers" such as their race, gender, height, weight, clothing, or even how many there were; and only indicated that they rode in a white car, with no further description of the car. Defendant further contends there is no indication that police had any

7

experience with the informant; that there was no face-to-face with the informant; and that the informant indicated an unwillingness to get involved, seriously undercutting her credibility.

The Government contends the officers had reasonable suspicion to stop Defendant and question him about drug distributions, which was the basis of the 911 call.

**Discussion**

The Fourth Amendment provides that "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Constitutional Amen. IV. Warrantless seizures are "*per se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347 (1967).

The Fourth Amendment is not implicated in a police-citizen encounter, where law enforcement officers approach someone in a public place and speak with him or her or ask the person to answer a few questions. Florida v. Bostick, 501 U.S. 429 (1991); Florida v. Royer, 460 U.S. 491 (1983); United States v. Weaver, 282 F.3d 302 (4th Cir. 2002), cert. denied, 537 U.S. 847 (2002); United States v. Flowers, 912 F.2d 707 (4th Cir. 1990). However, the Fourth Amendment is implicated once an individual has been "seized" - - that is, when the subject is no longer "free to leave." Michigan v. Chesternut, 486 U.S. 567 (1988); Immigration & Naturalization Serv. v. Delgado, 466 U.S. 210 (1984); United States v. Mendenhall, 446 U.S. 544 (1980); United States v. Sullivan, 138 F.3d 126 (4th Cir. 1998); United States v. Lattimore, 87 F.3d 647 (4th Cir. 1996) (*en banc*). "Generally speaking, a 'seizure' warranting protection of the Fourth Amendment occurs when, in the view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to leave or otherwise terminate the encounter." Weaver, 282 F.3d at 309-10.

8

See also Sullivan, 138 F.3d at 133; Lattimore, 87 F.3d at 653; United States v. Wilson, 953 F.2d 116 (4th Cir. 1991); United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989); and United States v. Alpert, 816 F.2d 958 (4th Cir. 1987).

The district court's determination of whether a seizure occurred is factual in nature and will be overturned on appeal only if clearly erroneous. Wilson, 895 F.2d at 172; Gordon, 895 F.2d at 937-38; United States v. Clark, 891 F.2d 501 (4th Cir. 1989).

Defendant here argues that "this Court should find that no reasonable suspicion existed, and that the stop of Mr. Washington was not justified."

"Although a 'reasonable articulable suspicion' is required prior to an investigatory detention, the requirement only applies if a 'seizure' has occurred." "'Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." "The standard adopted by the Supreme Court to determine whether a 'seizure' has occurred is an objective one-an individual is seized 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" "The agents' conduct must be measured according to the probable perspective of a reasonable person, *not the subjective perception of the particular Defendant*." United States v. Wilson, supra at 170 (internal citations omitted)(emphasis added by the undersigned). [2]

---

[2] Although Ptl. Dalton testified in response to the Court's question, that he probably would have chased Defendant had he not stopped, the question was hypothetical. There is no evidence that Defendant believed he was not free to leave and there is no evidence that, even if Ptl. Dalton had thought he might chase Defendant, that Defendant would have been aware of what the officer was thinking. The response therefore does not impact the undersigned's determination that Defendant stopped and stayed and spoke with Ptl. Dalton while he was free to leave.

There is no factual dispute that the encounter between Ptl. Dalton and Defendant took place in a public place. Florida v. Bostick, *supra.* It is undisputed that Ptl. Dalton called out to Defendant to "stop," saying he "needed to talk to him." Ptl. Dalton testified he used a "commanding voice" when he called out to Defendant in order to "get his attention." Defendant did stop and did talk to Ptl. Dalton. Ptl. Dalton asked him several questions and Defendant answered. He asked Defendant if he had seen or knew about any drug activity taking place. He asked Defendant why he was so nervous compared to other times he had spoken with him, and Defendant volunteered the marijuana. After that "did not appear to relieve his anxiety," Ptl. Dalton asked Defendant if there was something else he was nervous about– if he had a gun. Defendant said, "yes," looked toward his crotch area, and allowed the officer to get the gun.

Based on all of the above, the undersigned does not find Defendant was seized prior to his telling the officer he had a gun, after which the officer retrieved the gun and handcuffed him. Ptl. Dalton had simply called out, "Stop! I need to talk to you," and Defendant stopped and talked to him. The Fourth Amendment is not implicated in a police-citizen encounter, where law enforcement officers approach someone in a public place and speak with him or her or ask the person to answer a few questions. Bostick.

### B. Terry Stop

In the alternative, an officer may stop and briefly detain a person for investigative purposes (known as an investigative or Terry stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be

drawn at the time of the stop. United States v. Arvizu, 544 U.S. 266 (2002); United States v. Crittendon, 883 F.2d 326 (4th Cir. 1989).

The legitimacy of an investigative stop thus turns on what constitutes "reasonable suspicion," which the Fourth Circuit has called "a common-sensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151 (4th Cir. 1993). Accord Arvizu, 544 U.S. at 273.

Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. See, e.g., United States v. Harris, 39 F.3d 1262 (4th Cir. 1994) (officer's observation of man leaving apartment in a vehicle after confidential informant advised drug delivery was imminent constitutes reasonable suspicion to stop vehicle) ; United States v. Turner, 933 F.2d 240 (4th Cir. 1991)(officer with experience in narcotics investigations had reasonable suspicion to stop and determine whether subject was "cooking" illegal drugs after observing her carry cup of water out of convenience store, walk to car, and lean over front seat as if to hide something); and United States v. Moore, 817 F.2d 1105 (4th Cir. 1987)(officer's nighttime observation of man walking away from otherwise deserted area where burglar alarm had just gone off constitutes reasonable suspicion to stop man).

On the other hand, an officer's reliance on a "mere hunch," or an uncorroborated anonymous tip, is not sufficient to establish reasonable suspicion. Arvizu, supra, at 274; Accord Florida v. J.L., 529 U.S. 266 (2000)(anonymous telephone tip that young black male at bus stop wearing plaid shirt was carrying a gun did not constitute "reasonable suspicion"); United States v. Brown, 401 F.3d 588 (4th Cir. 2005)(anonymous tip that a short, black male outside an apartment complex was carrying firearm did not constitute "reasonable suspicion to justify a Terry stop"); United States v. Jones, 242

F.3d 215 (4th Cir. 2001)(vehicle stop based on uncorroborated anonymous tip held unconstitutional, suppressing evidence and vacating conviction); and United States v. Sprinkle, 106 F.3d 613 (4th Cir. 1997)("reasonable suspicion" must include "particularized evidence that . . . criminal activity is afoot," finding government's showing lacking on the facts of that case).

On the other hand, information received from an anonymous source can establish reasonable suspicion when it includes "sufficient indicia of reliability." United States v. Elston, 479 F.3d 314 (4th Cir. 2007). Accord United States v. Perkins, 363 F.3d 317 (4th Cir. 12005)(distinguishing J.L. where anonymous caller revealed her general location and described the activity she was observing at the time of her call); and United States v. Quarles, 330 F.3d 650 (4th Cir. 2003)(crediting tipster's "detailed description of the defendant").

Many factors have been approved as properly contributing to "reasonable suspicion." Among them: (1) presence in a high crime area, Perkins, supra at 320-321; United States v. Christmas, 222 F.3d 141 (4th Cir. 2000); Lender, supra at 154; Moore, supra at 1107; (2) informant tips and information, including anonymous tips if there has been some independent corroboration of the information, Alabama v. White, 496 U.S. 325 (1990); (3) lateness of the hour, Lender, supra at 154; (4) observation by law enforcement of what appears to be a drug transaction or other criminal conduct based on their experience, Terry, supra at 22-23; (5) evasive conduct, United States v. Smith, 396 F.3d 579, 585-87 (4th Cir. 2005); United States v. Humphries, 372 F.3d 653 (4th Cir. 2004); United States v. Tate, 648 F.2d 939 (4th Cir. 1981)(attempt by subjects to hide their faces); (6) furtive behavior, United States v. Sims, 296 F.3d 284 (4th Cir. 2002)(anonymous tip that black male wearing certain clothing had just fired handgun followed by observation of man fitting description engaged in "furtive behavior" together constituted reasonable suspicion.)

12

Neither being in a "high crime area" nor "unprovoked flight," standing alone, is enough to constitute "reasonable suspicion." Illinois v. Wardlow, 528 U.S. 119 (2000). However, each is a relevant factor and when they occur together – that is, when an individual in a high crime area flees at the sight of law enforcement - - there is reasonable suspicion to support a Terry stop. Id. Accord United States v. Mayo, 361 F.3d 802 (4th Cir. 2004)(being in high crime area, combined with suspicious, evasive, and nervous conduct constituted "reasonable suspicion" and justified frisk for officer's protection); and Christmas, supra at 145 ("although [the defendant's] presence in a high crime area is not alone sufficient to justify a Terry stop, the fact that the stop occurred in a high crime area [is] among the relevant contextual considerations in a Terry analysis").

In Wardlow, the Supreme Court distinguished between "unprovoked flight," which is inherently suspicious, and a situation in which an individual "ignore[s] the police and go[es] about his business" or simply "refuses to cooperate," which are not inherently suspicious. Id. at 125, citing Florida v. Royer, 460 U.S. 491 (1983)(when an officer, without reasonable suspicion or probable cause, approaches an individual, he has a right to ignore police and "go about his business"); and Florida v. Bostick, supra at 437 (refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure").

Absent probable cause to arrest, only a brief investigative detention is permitted under a Terry stop. Thus, there are cases in which a defendant contends either that a Terry stop was, in fact, an arrest without probable cause, or that a proper Terry stop escalated into an arrest without probable cause.

The fact or perception of a subject that he is not "free to leave," standing alone, is insufficient to convert a Terry stop into an arrest. Leshuk, supra, at 1109-10. On the other hand, at some point

13

what began as investigative detention during a Terry stop becomes too long and therefore escalates into a de facto arrest. However, the point at which this occurs is not subject to "a hard and fast time limit," United States v. Sharpe, 470 U.S. 675 (1985), but must be determined on a case by case basis.

Miranda warnings are not required when a person is questioned during a Terry stop. United Sates v. Leshuk, 65 F.3d 1105 (4th Cir. 1995).

A trial court's determination of "reasonable suspicion" is reviewed de novo; however, the appellate court should "give due weight to inference draw from the facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690 (1996). Accord Arvizu, supra at 274-275; and Lender, supra at 154.

Defendant here contends that no reasonable suspicion existed for the stop, arguing that "the tip provided to the police carried no indicia of reliability regarding its assertion of illegal activity, and therefore, could not establish the reasonable suspicion necessary to properly support an investigative stop." Further, "[t]he only information that Officer Dalton was aware of was that a call had been received by the dispatcher about the presence of so-called 'drug dealers' in the Fairmont Hills Apartment area." Defendant correctly asserts that the 911 caller did not relay any distinguishing features about the "drug dealers" or the white car in the parking lot.

The caller did, however, identify herself as Jewel Douglas, an employee of the Fairmont Hills Apartment complex. She said she was in the apartment office at the time of the call. She said there were "drug dealers" sitting under the pavilion, and that they rode in a white car. When asked to further describe the car, Ms. Douglas said she didn't know makes and models of cars, and did not want to go out there and be obvious, but then said she saw her maintenance man, and can be heard on the tape asking someone she referred to as "Anthony" about the car. The undersigned finds the 911 call included some indicia of reliability, and was not merely an anonymous tip.

14

Ptl. Dalton was informed by dispatch that there was a white vehicle, with drug activity going on in or around the vehicle. He recalled he was told either that the vehicle was occupied or there were people around the vehicle, parked near the pavilion, with drug activity taking place. He believed that if a person called 911 to report "drug dealers" but the dispatcher told him there was drug activity, the two were usually associated. "Someone's probably not gonna call the police and ask for police assistance just because someone . . . I mean, they may, in some instances, call in and say, 'hey, there are people here who are drugs dealers,' we get all kinds of bizarre calls. But, in this situation, my thinking while I was responding and the way it was dispatched to me, was that this was drug activity taking place and they wanted an officer to come."

When the officers pulled into the parking lot in their marked patrol car, they observed a white vehicle with two black men in it. The car was very near the pavilion, which was also very near the parking lot. There was no other vehicle with people in it, and no other white vehicle in the area. As the officers pulled up to the white car, Defendant got out of the car and began walking quickly away, toward the back of the car, looking back over his shoulder at the officer. Ptl. Dalton believed Defendant exited the car and began walking quickly away because of his presence. He called out to Defendant to stop, saying he wanted (or needed) to talk to him and Defendant stopped. Ptl. Dalton noticed Defendant was very nervous, shaking all over, with visible perspiration on his face.

Regarding the factors previously discussed as contributing to reasonable suspicion, the undersigned finds that the hour was not necessarily late, the officers did not observe what appeared to be criminal conduct, and Ptl. Dalton admitted he did not observe a bulge in Defendant's clothing (factors (3), (4), and (7)). On the other hand, Ptl. Dalton testified that the Fairmont Hills Apartment complex was regarded as a "high crime area," at least relative to the surrounding areas (factor (1)); the tip, as already discussed, was not totally anonymous, having some indicia of reliability (factor

15

(2)); and Defendant's exiting the car and walking quickly away while looking back at the officer could be perceived as evasive conduct (factor (5)) and/or "furtive behavior" (factor (6)). Although Ptl. Dalton could not see Defendant's "body shaking all over" or the visible perspiration on his face until after he stopped, those are additional factors supporting Ptl. Dalton's brief investigation.

When an individual in a high crime area flees at the sight of law enforcement - - there is reasonable suspicion to support a Terry stop. Illinois v. Wardlow, 528 U.S. 119. Accord United States v. Mayo, 361 F.3d 802 (4th Cir. 2004)(being in high crime area, combined with suspicious, evasive, and nervous conduct constituted "reasonable suspicion" and justified frisk for officer's protection); and Christmas, supra at 145 ("although [the defendant's] presence in a high crime area is not alone sufficient to justify a Terry stop, the fact that the stop occurred in a high crime area [is] among the relevant contextual considerations in a Terry analysis"). This is not a case in which Defendant "ignored the police and [went] about his business" or simply "refuse[d] to cooperate." Here, Ptl. Dalton testified that Defendant exited the car as soon as the police car pulled up to it; was walking quickly away from the car, looking back over his shoulder; and appeared nervous. Ptl. Dalton expressly testified that Defendant did not exit and walk away from the car in a manner "like, ok, gotta get something from my house." Defendant here was in a high crime area, combined with suspicious, evasive, and nervous conduct, constituting reasonable suspicion. Mayo, supra.

The legitimacy of an investigative stop turns on what constitutes "reasonable suspicion," which the Fourth Circuit has called "a common-sensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151 (4th Cir. 1993). Accord Arvizu, 544 U.S. at 273.

Upon consideration of all of the above, the undersigned finds that, based on a totality of the circumstances, Ptl. Dalton had "reasonable suspicion," based on articulable facts, that criminal

16

activity was afoot. <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989); <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). He therefore legitimately stopped and briefly questioned Defendant for investigative purposes.

The undersigned therefore recommends Defendant's Motion to Suppress be **DENIED**.

## RECOMMENDATION

The undersigned recommends Defendant Washington's Motion To Suppress [Docket Entry 15] be **DENIED.**

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed report and recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

DATED: July 10, 2008

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE