IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

     Plaintiff,

    v.                          CRIMINAL NO.  1:08CR42
                                         (Judge Keeley)

JOHN D. WASHINGTON,

     Defendant.


MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATION

On June 23, 2008, the defendant, John D. Washington ("Washington"), by his attorney, Assistant Federal Defendant Katy J. Ratai, filed a motion to suppress all physical and other evidence obtained as a result of a police stop of Washington on October 2, 2007.  The United States filed a response on July 1, 2007, and the matter was referred to United States Magistrate Judge John S. Kaull, who, on July 10, 2008, issued a Report and Recommendation ("R&R"), recommending that the motion be denied.  For the following reasons, the Court **ADOPTS** the R&R and **DENIES** the motion to suppress.

## I.  FACTS AND PROCEDURAL HISTORY

Washington was indicted on May 6, 2008, on a charge of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  After the Court referred his motion to suppress to Magistrate Judge Kaull for an R&R on June 30, 2008, the

## MEMORANDUM OPINION AN ORDER
### ADOPTING REPORT AND RECOMMENDATION

Magistrate Judge conducted a hearing on the matter on July 2, 2008. At that hearing, the Government presented testimony from Patrolman Aaron Dalton ("Dalton"), a police officer with the City of Fairmont, and played a recording of the 911 call that precipitated the incident under review. A review of the tape recording of the hearing establishes the following:

1) On October 2, 2007, at approximately 5:15 p.m., a woman at the Fairmont Hills Apartments in Marion County, West Virginia placed a call to 911. The recording of the 911 call reveals that the woman requested "Um, can I get some officers to come and patrol my, uh, parking lot? I got some drug dealers out here. I don't want 'em here." The 911 operator then asked what vehicle they were in, and the woman replied "[t]hey're out here now, sitting underneath of the pavilion. And they are, they do ride in a white car. I don't know what the name of this car is. I hate to go out here and be so obvious;"

2) The 911 operator then requested the woman's name, and she replied "My name is Miss Douglas – Jewel Douglas. I'm in the office now. Here comes my maintenance man . . . ." The 911 dispatcher then contacted the Fairmont Police Department and Dalton, joined by Patrolman John Miller, was dispatched to the scene in a marked police car;

## MEMORANDUM OPINION AN ORDER
## ADOPTING REPORT AND RECOMMENDATION

3) Dalton testified that the Fairmont Hills Apartments to be an area in which a lot of drug activity occurs.  He said that he is frequently dispatched there, typically at least once a week.  He testified that the complex is sometimes referred to as the "The Carter," "New Jack City" and "Crack Haven."  He believes that "New Jack City" and "Crack Haven" are nicknames referring to the drug activity that takes place there.  He further testified that Fairmont Hills Apartments is a low-income housing area with a high density population, that a lot of drinking goes on there, and that he gets a lot of "domestic" calls to that area.  He admitted, however, that he could not recall making any arrests in that area for drugs, but he believes that the local drug task force has made such arrests;

4) On the evening in question, Dalton and Miller arrived a few minutes after the 911 call was placed.  Upon entering the parking lot, Dalton observed a white Chevy Caprice in front of the pavilion area.  There were no other cars in the area matching the 911 caller's description.  Two black males were inside the car; Washington was in the driver's seat and an individual named Howard English was in the front passenger seat.  Dalton was familiar with both men from having seen them around town, but he did not recall having previously arrested either of them;

## MEMORANDUM OPINION AN ORDER
### ADOPTING REPORT AND RECOMMENDATION

5) As Dalton pulled in front of the white car, Washington left the car and began walking toward the pavilion.  Dalton testified that Washington walked away quickly, glancing back over his shoulder towards the police car.  His hands were around the area of his waistband.  Dalton suspected that Washington was leaving the area because of the police officers' presence, and that he appeared nervous as he left the car and began walking away;

6) As Washington walked away, Dalton called out "Stop, I want to talk to you."  He said it loudly enough to get Washington's attention, and said it in a commanding voice, but he did not raise his gun or put his hand on his gun.  Dalton admitted that, had Washington not stopped, he would have chased him.  Washington did stop, however, and walked back towards Dalton.  Dalton then told Washington that the officers had received a 911 call about drug transactions taking place in the area, and that Washington's car fit the description given in the call.  He asked Washington if he had any knowledge of what was going on;

7) Dalton described Washington's demeanor at this time as "very nervous."  He was "shaking all over," had visible perspiration on his face and his voice sounded nervous.  Dalton said that Washington was acting very differently from when Dalton had previously spoken with him, because Washington was normally a

calm, articulate person.  Dalton asked Washington if he had anything in his possession that Dalton needed to know about, whether drug activity was going on, and why was he so nervous. Washington allegedly stated that he did not want Dalton to arrest him for what he had in his pocket.  Dalton told him that if it was only a small amount of marijuana or something in that nature, and if Washington handed it over, there would not be a problem;

8) At that point, Washington pulled a small bag of what appeared to be marijuana out of his pocket and handed it to Dalton. Washington continued to appear very nervous, however, and Dalton stated that he "knew there was something more there."  He then "began to become fearful from [Washington's] demeanor.  He began to scare me;"

9) Washington was holding onto the front of his pants and Dalton asked him if he had a gun.  Washington responded that he did and looked at the front of his pants, towards his crotch area, indicating that was where the gun was located.  Dalton recovered a loaded Ruger P90 .45 automatic hand gun.  He then arrested Washington and searched him more thoroughly, finding a large sum of cash (between $1700 and $1800) but no additional drugs or guns. The other individual arrested with Washington, Howard English, had crack cocaine on his person; and

**MEMORANDUM OPINION AN ORDER**
**ADOPTING REPORT AND RECOMMENDATION**

10) Dalton testified that he did not hear the 911 call at the time he was dispatched to the Fairmont Hills Apartments. Instead, he said the police dispatcher told him there was "drug activity" going on in or around a white vehicle at the Fairmont Hills Apartments. Dalton testified that he understood the call to mean that drug activity was taking place, not then that the defendant was merely a drug dealer who was not actually involved in drug activity at that time.

Following the hearing, on July 10, 2008, the Magistrate Judge issued an R&R recommending that the motion to suppress be denied. Specifically, the Magistrate Judge found that, under U.S. v. Sokolow, 490 U.S. 1, 7 (1989) and Terry v. Ohio, 392 U.S. 1, (1968), Patrolman Dalton had reasonable suspicion, based on sufficient articulable facts, to justify his stop of Washington. Washington filed timely objections to the R&R on July 24, 2008, to which the Government responded on August 1, 2008. Accordingly, the issue is ripe for the Court's consideration.

**II.  OBJECTIONS TO THE R&R**

Washington objects to the R&R on multiple grounds. First, he objects to the characterization of the "stop" as a police-citizen encounter, and instead contends he was unconstitutionally "seized"

6

## MEMORANDUM OPINION AN ORDER
### ADOPTING REPORT AND RECOMMENDATION

by Dalton when he was ordered to stop. He further argues that, when Dalton ordered him to stop, Dalton lacked articulable facts on which to base a reasonable suspicion that criminal activity was afoot.  In support of this argument, Washington objects to the Magistrate Judge's findings that the Fairmont Hills Apartments is a high crime area, that Washington's behavior when he got out of the car and walked away was "furtive" or "evasive," and that the 911 phone call had sufficient indicia of reliability.

Finally, Washington argues that the tip provided by Jewell Douglas to the 911 operator was altered by the police dispatcher, who informed Patrolman Dalton that there was "drug activity" occurring rather than that "drug dealers" were present.  Washington contends that mistakes on the part of the dispatcher should not be held against him.

### II.  LEGAL ANALYSIS

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  U.S. v. Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392 U.S. 1, 9 (1968)).  Nevertheless, in Terry v. Ohio, 392 U.S. at 22, 30, the United States Supreme Court

## MEMORANDUM OPINION AN ORDER
### ADOPTING REPORT AND RECOMMENDATION

held that the Fourth Amendment permits an officer to stop and briefly detain a person for investigative purposes, even in absence of probable cause to arrest, if the officer has a "reasonable suspicion" that criminal activity is afoot.  Such brief detentions have come to be called "<u>Terry</u> stops."

Reasonable suspicion is based on a totality of the circumstances, including the information known to the officer at the time of the stop and any reasonable inferences that could be drawn from it.  <u>Arvizu</u>, 534 U.S. at 274.  A mere "hunch" that criminal activity is occurring is not enough; the officer must have a "particularized and objective basis for suspecting legal wrongdoing."  <u>Id.</u>  The reasonableness of the suspicion is measured by what the officers knew prior to the search.  <u>Florida v. J.L.</u>, 529 U.S. 266, 271 (2000).  The Fourth Circuit has characterized "reasonable suspicion" as a "common-sensical proposition . . . crediting the practical experience of the officers who observe on a daily basis what transpires on the street." <u>U.S. v. Lender</u>, 985 F.2d 151, 154 (4th Cir. 1993).  Importantly, "[t]he necessary level of suspicion for a brief investigatory detention is appreciably less than the prerequisite level for a finding of probable cause." <u>U.S. v. Wilson</u>, 953 F.2d 116, 124 (4th Cir. 1991).

**MEMORANDUM OPINION AN ORDER**
**ADOPTING REPORT AND RECOMMENDATION**

Finally, a warrantless search, often called a "frisk," of an individual is justified where an officer has a reasonable belief that the individual is armed and dangerous and could pose a threat to the officer's safety. Terry, 392 U.S. at 27 ("[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.")

### A. Patrolman Dalton's Stop of Washington was not an unconstitutional "seizure."

Washington first contends that Dalton's actions constituted an unconstitutional seizure. He argues that the seizure occurred when Dalton told Washington "Stop, I want to talk to you" because, given Dalton's tone, Washington would not have felt free continue walking and leave the area. Washington argues that a seizure, for Fourth Amendment purposes, occurs

> when consideration of all the circumstances surrounding
> the encounter shows that the police conduct would have
> communicated to a reasonable person that he or she was

MEMORANDUM OPINION AN ORDER
ADOPTING REPORT AND RECOMMENDATION

not free to decline the officer's requests or otherwise terminate the encounter.

<u>U.S. v. Alarcon-Gonzales</u>, 73 F.3d 289, 291 (8th Cir. 1996). He contends that, although Dalton did not physically prevent him from leaving, Dalton asserted his authority by the tone of his voice and the words he used. Washington further argues that the manner in which Dalton pulled his marked patrol car into the parking lot added to Dalton's display of authority.

Federal courts have distinguished consensual police-citizen encounters, which require no objective justification, from <u>Terry</u> stops that must be based on reasonable suspicion. <u>U.S. v. Brown</u>, 401 F.3d 588, 592 (4th Cir. 2005). In <u>Florida v. Bostick</u>, 501 U.S. 429, 431 (1991), the United State Supreme Court reiterated the well-established principle that

the Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate.

"Such an encounter 'will not trigger Fourth Amendment scrutiny, unless it loses its consensual nature.'" <u>U.S. v. Wilson</u>, 953 F.2d 116, 121 (4th 1991) (<u>quoting</u> <u>Bostick</u>, 501 U.S. at 434). Thus, where an officer approaches an individual in a public place without probable cause or reasonable suspicion to believe that illegal

10

## MEMORANDUM OPINION AN ORDER
## ADOPTING REPORT AND RECOMMENDATION

activity is taking place, the relevant question is whether that person reasonably would have felt that he or she was "free to leave." Id.

Where an officer has a reasonable suspicion to believe that criminal activity is afoot, however, a brief seizure and detention of such suspect is within the bounds of the Fourth Amendment. See Terry, 392 U.S. at 30; U.S. v. Black, 525 F.3d 359 (4th Cir. 2008). The Fourth Circuit has clearly explained that, when the stop is justified by reasonable suspicion, the fact that a defendant did not feel free to leave is no longer relevant. U.S. v. Elston, 479 F.3d 314, 319-20 (4th Cir. 2007).

In Elston, the police received a 911 report that an intoxicated individual, armed with a loaded handgun, was driving in a truck in a certain area of town. Id. at 315. After locating an individual in a truck matching the description given by the 911 caller, an officer approached the truck with his service weapon drawn, ordered the defendant out of the truck, and handcuffed him. Id. at 316. A gun was quickly located and the defendant was then arrested. Id. The district court ruled that the officer had a reasonable suspicion to conduct a Terry stop, and that the initial detention was only a Terry stop and not a full arrest. Id.

11

## MEMORANDUM OPINION AN ORDER
## ADOPTING REPORT AND RECOMMENDATION

In challenging the district court's findings on appeal, the defendant argued that the initial detention was actually a full arrest because no reasonable person in the circumstance would have believed himself free to leave.  Id. at 319.  The Fourth Circuit disagreed:

> We have expressly recognized that 'the perception that one is not free to leave is insufficient to convert a Terry stop into an arrest.  A brief but complete restriction of liberty is valid under Terry.' Additionally, we have observed that 'Terry stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion,' not because of 'the absence of any restriction of liberty.'

Id. at 319-20 (quoting U.S. v. Leshuk, 65 F.3d 1105, 1109 (4th Cir. 1995)).

Similarly, had Dalton reasonably believed that criminal activity was afoot, thereby justifying a Terry stop in this case, then the fact that a reasonable person in Washington's position may not have felt free to leave is of no consequence.  The Court, therefore, turns to the question of whether Dalton reasonably believed criminal activity was afoot.

**B.    Patrolman Dalton's stop of Washington was a based on reasonable suspicion.**

Magistrate Judge Kaull found that when Dalton initially stopped Washington sufficient reasonable suspicion existed to

**MEMORANDUM OPINION AN ORDER**
**ADOPTING REPORT AND RECOMMENDATION**

believe that criminal activity was afoot and that a <u>Terry</u> stop was justified.  Specifically, he found reasonable suspicion based on the 911 call, Dalton's knowledge that the Fairmont Hills Apartments was a high crime area, and Washington's evasive and suspicious behavior, which began when the officers arrived.  Because Washington objects to all of these findings, the Court will address each in turn.

### 1.  911 Phone Call

"In cases where an informant's tip supplies part of the basis for reasonable suspicion, we must ensure that the tip possesses sufficient indicia of reliability." <u>U.S. v. Perkins</u>, 363 F.3d 317, 323 (4th Cir. 2004).  "Where the informant is known . . . an officer can judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion." <u>Id.</u>  A tip from a known informant bears more credibility then that of an anonymous tipster, in part because the known informant "can be held responsible if her allegations turn out to be fabricated." <u>Florida v. J.L.</u>, 529 U.S. at 270.

a.

Washington contends that the 911 tip in this case did not bear sufficient indicia of reliability because the caller provided

13

## MEMORANDUM OPINION AN ORDER
## ADOPTING REPORT AND RECOMMENDATION

little identifying information about the suspect.  He compares the
911 call in this case to that in <u>United States v. Brown</u>, 401 F.3d
588, 596 (4th Cir. 2005), where the police received an anonymous
phone tip that a short, black male with glasses was carrying a
firearm outside an apartment.  <u>Id.</u> at 590.  The Fourth Circuit held
that the tip in that case was not sufficient to justify a <u>Terry</u>
stop, in part because "the tip provided nothing more than a brief,
general description of Brown, his whereabouts, and an allegation
that he was carrying a firearm."  <u>Id.</u> at 596.

Washington argues that, like the tipster in <u>Brown</u>, the
informant in this case failed to provide a competent description of
Washington.   In <u>Brown</u>, however, the tip was anonymous, thus
requiring the officers to corroborate the tip before relying on it.
Here, the 911 caller identified herself as Jewell Douglas, who, as
the context of the call made apparent, was an employee of the
Fairmont Hills Apartments and was present at the apartment
building's "office" at the time of the call.   With this
information, the police would have had no trouble seeking her out
later in order to hold her accountable for providing false
information.

Furthermore, the Fourth Circuit has held that where an officer
has "objective reason to believe that [a] tip had some particular

14

## MEMORANDUM OPINION AN ORDER
## ADOPTING REPORT AND RECOMMENDATION

indicia of reliability, the tip can rightfully support an officer's decision to investigate further, even without the presence of predictive information." Perkins, 363 F.3d at 325 (internal citation omitted). In this case, Douglas did not provide predictive information regarding acts that Washington was likely to engage in, but she did describe the suspects' location (under the pavilion near the parking lot) and the color of their car (white). Patrolman Dalton testified that only one car in the parking lot matched the given description. Because a tip by a known informant carries a higher indicia of reliability than does that of an anonymous informant, see U.S. v. Perkins, 363 F.3d at 323, the Court finds that the information provided in the tip, combined with the fact that the identity of the caller was known, created a sufficient indicia of reliability for Dalton to have properly investigated the tip further.

b.

Washington additionally argues that the tip did not actually allege any criminal conduct, but rather that the tipster merely stated that "drug dealers" were present. As he points out, knowledge that an individual is a known drug dealer is not sufficient to justify a Terry stop. U.S. v. McCoy, 513 F.3d 405, 418 (4th Cir. 2008). He acknowledges, however, that Patrolman

15

## MEMORANDUM OPINION AN ORDER
### ADOPTING REPORT AND RECOMMENDATION

Dalton testified at the suppression hearing that he was not informed that "drug dealers" were loitering at the apartments, but rather that "drug activity" was taking place. Nevertheless, he argues that the discrepancy was the fault of the police dispatcher and should not be used against him.

In determining whether Dalton had reasonable suspicion to stop Washington, the Court must "assess the relevant facts <u>known to the authorities</u> and decide whether those facts, from the standpoint of an objectively reasonable police officer, give rise to reasonable suspicion or probable cause. <u>U.S. v. Singh</u>, 363 F.3d 347, 354 (4th Cir. 2004) (emphasis added) (internal quotation omitted). Here, Dalton was informed that "drug activity" was taking place, information that an objectively reasonable officer would understand to mean that illegal activity was afoot. The Court can find no precedent supporting Washington's argument that the information known to the dispatcher should be imputed to Patrolman Dalton. Accordingly, it declines to find that Dalton lacked sufficient evidence on which to base a reasonable suspicion on the basis that the dispatcher conveyed inaccurate information to him.

### 2.  Evasive Conduct

## MEMORANDUM OPINION AN ORDER
## ADOPTING REPORT AND RECOMMENDATION

Evasive conduct on the part of a suspect is a second factor that may contribute to an officer's justification of a <u>Terry</u> stop. <u>U.S. v. Smith</u>, 396 F.3d 579 (4th Cir. 2005).  In its most extreme form, evasive behavior is exhibited by headlong flight, predicated on the arrival of law enforcement officers.  The Fourth Circuit has held, however, that evasive conduct that stops short of headlong flight may still be properly considered among the factors constituting reasonable suspicion.  <u>U.S. v. Lender</u>, 985 F.2d 151, 154 (4th Cir. 1993) ("The defendant's conduct after the officers left their car but before Officer Hill called "Stop" did nothing to allay the officers' earlier suspicions. When the officers tried to approach Lender, he attempted to evade them by turning his back and walking away. Evasive conduct, although stopping short of headlong flight, may inform an officer's appraisal of a street corner encounter.").

Here, Dalton testified that he arrived at the Fairmont Hills Apartments in a marked police car wearing his police uniform and pulled up in front of the white car containing Washington.  As he arrived, Washington exited his car and began walking quickly away from the rear of the car while glancing over his shoulder at Dalton.  Although Washington argues that he was not engaged in headlong flight, and could have had a legitimate reason for walking

## MEMORANDUM OPINION AN ORDER
### ADOPTING REPORT AND RECOMMENDATION

away, the Court finds that Dalton drew a reasonable inference from Washington's behavior when he concluded that Washington's departure was based on the arrival of the police. Thus, this factor was properly considered by Magistrate Judge Kaull in concluding that Dalton had reasonable suspicion justifying his stop of Washington.

### 3. High Crime Area

Finally, the presence of a suspect in a high crime area may also contribute to an officer's reasonable suspicion. E.g., U.S. v. Perkins, 363 F.3d 317 (4th Cir. 2005). As the Fourth Circuit has held, "although [the defendant's] presence in a high crime area is not alone sufficient to justify a Terry stop, 'the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis." U.S. v. Christmas, 222 F.3d 141, 145 (4th Cir. 2000)(citing Illinois v. Wardlow, 528 U.S. 119 (2000)).

Dalton testified that, in his seven years as a Fairmont City police officer, he had been summoned to the Fairmont Hills Apartments on many occasions, sometimes weekly, usually on domestic violence and alcohol-related calls. Although he had not personally made drug arrests in that area, he knew that such arrests had been made by officers with the local drug task force. Finally, he was

aware of the complex's drug-related nicknames of "crack haven" and "New Jack City," the latter of which references a film portraying the exploits of a drug kingpin in New York City.

Washington argues that Dalton did not have a sufficient basis to believe that the Fairmont Hills Apartments is a high crime area because he had no first-hand knowledge of the purported drug activity. He further argues that no evidence, other than Dalton's testimony, was presented to show that it is a high crime area and, thus, such an assertion is mere conjecture.

Although Dalton had not personally arrested individuals in the Fairmont Hills Apartments for drug-related crimes, his experiences as a police officer in that neighborhood, combined with his knowledge of arrests made by other local law enforcement officers and the general reputation of the Apartments, provide a sufficient basis for Dalton to have reasonably believed that the Fairmont Hills Apartments are a high crime area. See Lender, 985 F.2d at 154 (The Court should credit "the practical experience of the officers who observe on a daily basis what transpires on the street."). The Magistrate Judge therefore properly considered this factor in determining whether Dalton had reasonable suspicion on which to base the Terry stop.

### 4. Totality of the Circumstances

## MEMORANDUM OPINION AN ORDER
## ADOPTING REPORT AND RECOMMENDATION

When considering the totality of the circumstances existing at the time that Patrolman Dalton called out to Washington "Stop, I want to talk to you," sufficient articulable facts existed to give Dalton reasonable suspicion that illegal activity might be afoot. As previously discussed, the 911 call was not anonymous.  The caller provided her name and location, and made statements to indicate that she was an employee of the Apartments, thereby providing the means to find her later, and giving the tip some indicia of reliability.  <u>See</u> <u>Christmas</u>, 222 F.3d at 144 (<u>citing</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 233-34 (1983)).

Moreover, although the caller stated that "drug dealers" were outside and she wanted them gone, Dalton testified that he was informed by the dispatcher that "drug activity" was taking place. Thus, given what information was available to Dalton at the time, it was reasonable for him to believe that criminal activity was afoot, rather then that Washington merely had the status of a "drug dealer."

Third, through his experience as a police officer, Dalton knew that the Fairmont Hills Apartments was a high crime area, known for drug problems.  While presence in such an area by itself is not sufficient, the Fourth Circuit has held that being in a high crime area, combined with suspicious or evasive conduct, can constitute

## MEMORANDUM OPINION AN ORDER
### ADOPTING REPORT AND RECOMMENDATION

'reasonable suspicion' to justify a frisk of a suspect for an officer's protection. <u>U.S. v. Mayo</u>, 361 F.3d 802, 807 (4th Cir. 2004). Here, Washington displayed evasive conduct by walking away as the police car arrived, and by looking back over his shoulder. Then, when asked to come back by Dalton, Washington acted and sounded nervous. These factors were sufficient to provide Dalton with a basis to stop Washington and question him regarding the reported illegal conduct.

In sum, when looking at the totality of the circumstances, including what was known by Patrolman Dalton at the time of the stop and what reasonable inferences he could have drawn from that knowledge, Dalton had reasonable suspicion, based on specific and articulable facts, to believe that Washington may be involved in criminal activity; thus the <u>Terry</u> stop did not violate Washington's Fourth Amendment rights. The evidence obtained from that stop therefore is admissible.

### IV.   CONCLUSION

For the reasons stated above, the Court **ADOPTS** Magistrate Judge Kaull's R&R in its entirety (dkt. no. 21), and **DENIES** Washington's Motion to Suppress (dkt. no. 15).

It is so **ORDERED**.

**MEMORANDUM OPINION AN ORDER**
**ADOPTING REPORT AND RECOMMENDATION**

The Clerk is directed to transmit copies of this Order to counsel of record and all appropriate agencies.

DATED: August 28, 2008

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE